UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80581-Matthewman

PLAIN BAY SALES, LLC,

      Plaintiff and Counter-Defendant,

v.

ZUME GALLAHER AND
PAUL HAUNERT,

      Defendants, Counterclaimants,
      and Third-Party Plaintiffs,

v.

KATIE PRUDENT, ADAM PRUDENT,
HENRI PRUDENT, AND KATIE
MONAHAN, INC.,

      Third-Party Defendants.

_____/

FILED BY _____KJZ_____ D.C.

Feb 10, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## OMNIBUS ORDER ON ALL PENDING MOTIONS FOR SUMMARY JUDGMENT [DE 454; DE 455; DE 459] AND ON DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT [DE 529]

THIS CAUSE is before the Court upon all three pending motions for summary judgment:

Plain Bay Sales, LLC ("Plain Bay") Motion For Partial Summary Judgment Upon Plaintiff's

Third Amended Complaint [DE 454] ("Plain Bay's Motion"); the Joint Omnibus Motion By

Plaintiff Plain Bay Sales, And Counter And Third Party Defendants, For Summary Judgment

Upon The Amended Counterclaim / Third Party Claim ("Joint Parties' Motion")[1] [DE 455]; and

Defendants/Counterclaimants Zume Gallaher and Paul Haunert (together, "Defendants") Motion

---

[1]  Katie Prudent, Adam Prudent, Henri Prudent (together, "Prudents") and Katie Monahan, Inc. ("KMI") are referred collectively as the "Prudent Parties." Plain Bay and the Prudent Parties are referred collectively as "Joint Parties."

for Summary Judgment ("Defendants' Motion"). [DE 459]. The parties have filed Statements of

Material Fact and evidence to support their motions, and they have responded and replied to each

motion for summary judgment. *See* DEs 454-456, 459-460, 467, 475, 483-486, 509, 511, 516-

517, 523.[2] The parties also filed a Notice By All Parties As To Remaining Claims And Defenses,

which jointly set forth the remaining claims and defenses of the parties. [DE 432-1]. Plain Bay's

Motion, the Joint Motion, and Defendants' Motion are all now ripe for review[3], and the Court

has carefully considered the filings and attachments thereto, and the operative pleadings, as well

as the entire docket in this case.

## I.     INTRODUCTION

This is a case about the purchase and sale of a horse by the name of Victorio 5

("Victorio" or "the Horse"). On March 15, 2018, Plaintiff Plain Bay sold Victorio to the

purchaser, Defendant Zume Gallaher ("Zume"), for the purchase price of $950,000.00.

Ultimately, after the full purchase price was paid by or on behalf of Zume, she did not take

delivery of Victorio. Plain Bay initiated this action on May 3, 2018. [DE 1]. Thereafter, in July

2018, Plain Bay sold Victorio for $500,000 to another buyer, and sent Zume the net resale

proceeds in the amount of $455,647.50 on October 18, 2018.

Plain Bay's  operative complaint is the Third Amended Complaint ("Complaint"), which

brings five counts against one or more of the Defendants as follows: Count 1 alleges Breach of

Contract (for attempt at revocation of acceptance) against Zume; Count 2 alleges Breach of

---

[2] The parties are reminded that our Local Rules and the Court's CM/ECF procedures, Rule 3L (2), provide that the filer "descriptively name each attachment (e.g., Exhibit 1 - Affidavit of Boo Radley) in a manner that enables the Court to easily locate and distinguish attachments."  An exhibit titled only as "Exhibit 1[,] for example, does not allow the Court to easily locate and distinguish its attachments, particularly when there are twenty-nine other exhibits attached to a document. *See, e.g.,* DE 460.

[3] Defendants' related Request for Judicial Notice in Support of Motion For Summary Judgment [DE 529] is also ripe for review and will be addressed where appropriate, *infra.*

Contract (for attempt at rejection) against Zume; Count 3 alleges Breach of Contract (for wrongful repudiation and rescission) against Zume; Count 4 alleges Defamation by False Implication against Defendant Paul Haunert ("Paul"); and Count 5 alleges Vicarious Liability against Zume (for Paul's alleged defamatory conduct per Count 4). [DE 256].   To this Complaint, Defendants filed their answer and asserted twenty-four affirmative defenses. [DE 332].

Defendants' operative Counterclaim and Third Party Claim ("Counter-Complaint"), brings twelve counts against one or more of the Joint Parties as follows: Count 1 alleges Fraud against the Joint Parties; Count 2 alleges Civil Conspiracy against the Joint Parties; Count 3 alleges Breach of Express Warranty against Plain Bay; Count 4 alleges Breach of Implied Warranty of Fitness For a Particular Purpose against Plain Bay; Count 5 alleges Breach Of Implied Warranty of Merchantability against Plain Bay; Count 6 alleges a traditional violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.201 *et seq.* ("FDUPTA"), against the Joint Parties; Count 7 alleges a *per se* violation of FDUPTA (for improper bill of sale) against Plain Bay; Count 8 alleges a *per se* violation of FDUPTA (for refusal to honor return under section 501.142, Florida Statues) against Plain Bay; Count 9 alleges Unjust Enrichment against Plain Bay; Count 10 alleges Negligent Misrepresentation against the Joint Parties; Count 11 alleges Recission against Plain Bay; and Count 12 alleges entitlement to Attorney Fees for False Florida RICO Violation Allegation against Plain Bay. [DE 116].  To this Counter-Complaint, the Joint Parties answered and asserted a combined twenty-four affirmative defenses. [DEs 253, 254, 255].

Plain Bay moves for summary judgment in its favor on the pending counts in its Complaint. [DE 454 at 2]. The Joint Parties also move for summary judgment in their favor on

all counts in the Counter-Complaint and the related affirmative defenses, with the exception of Count 9 for Unjust Enrichment. [DE 455]. Defendants move for summary judgment in their favor on the remaining counts in Plaintiff's Complaint and the related affirmative defenses, and Defendants also move for summary judgment in their favor as to Counts 6, 7 and 8 of Defendants' Counter-Complaint. [DE 459].

As noted about, this case has been pending since May 3, 2018. [DE 1]. This case has been heavily litigated by all parties and has over 530 docket entries now at the conclusion of the summary judgment phase. In fact, this case has been over-litigated. Throughout this case, nearly everything has been disputed and it comes as no surprise that summary judgment has been no different. What started out as a simple transaction of the Horse on March 15, 2018 has blossomed into a potpourri of claims, counterclaims, third-party claims, accusations and affirmative defenses. This Order will dispose of several of the claims, counterclaims, third-party claims, and as a result, their corresponding affirmative defenses.[4] The surviving causes of action shall proceed to jury trial on February 28, 2022.

## II.     SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the

---

[4] The Court notes that the parties' summary judgment filings largely fail to specifically identify which of the affirmative defenses correspond to which Counts in the Complaint and Counter-Complaint and only make passing reference to the affirmative defenses rather than specifically moving for summary judgment on them. *See, e.g.*, DE 455 at 30 n.7 ("The absence of actual damages incurred by the Counterclaims was also raised by Plain Bay Sales and the Prudent Parties in their Tenth Affirmative Defense."). Therefore, when the Court denies summary judgment on a particular count, any implied argument for summary judgment on a corresponding affirmative defense is also denied. Similarly, when the Court grants summary judgment on a particular count, summary judgment is also granted as to any corresponding affirmative defense in line with the Court's stated reasoning.

record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (internal quotations omitted).

In deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the nonmoving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court also must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.     <u>STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE[5]</u>

a.   <u>The parties</u>

Plain Bay is a Florida Limited Liability Company that buys and sells horses and is owned by Adam Prudent ("Adam") and Henri Prudent ("Henri"). *See* Joint Parties' SMF ¶ 1; Defendants' SMF ¶ 6. Adam has an 80% ownership interest in Plain Bay and Henri has a 20% ownership interest in Plain Bay. [Defendants' SMF ¶ 8]. Plain Bay spends the "winter season" in Florida and the rest of the year its operations can be in Virginia, France or "any horse show." [Defendants' SMF ¶ 7].

Adam's mother is Katie Prudent ("Katie") and Adam's father is Henri, and Katie and Henri are married. [Joint Parties' SMF ¶ 2; Defendants' SMF ¶ 8; DE 116 ¶ 6]. Adam rides for Plain Bay. [Joint Parties' SMF ¶ 2]. Henri is a professional equestrian who has been in the business of buying and selling horses since 1985 and is the trainer of record for all of the Plain Bay horses. [Joint Parties' SMF ¶ 3]. Katie is an expert show jumping horse trainer. [Joint Parties' SMF ¶ 4]. She also serves as an advisor for Plain Bay and assists Plain Bay with the purchase and sale of horses and receives a commission on horses sold. [Joint Parties' SMF ¶¶ 7, 97]. However, the parties dispute whether Katie also is "the boss" at Plain Bay, whether she is in

---

[5] The following facts are drawn from the uncontested portions of the record together with the parties' statements of material facts and supporting evidence, and these facts are viewed in the light most favorable to the non-moving party. Here, Plain Bay, the Joint Parties, and Defendants have all moved for summary judgment; therefore, the facts are viewed in the light most favorable to the non-moving party in light of their respective arguments on summary judgment. To the extent a party has acknowledged that the opposing party's fact is "undisputed," the fact will be treated as undisputed for purposes of the pending motions. Where the response states that the fact is undisputed but not material, the Court has conducted a separate materiality assessment. Each party asserts that some of the opposing party's proposed facts are not properly supported by the evidence cited; therefore, to the extent a party fails to cite record evidence in support of an alleged fact, that alleged fact will not be considered proven. To the extent the parties' statements of material facts contain argument and characterizations of the facts, the Court has extracted the underlying facts from the record and ignored said characterizations. To the extent a fact is labeled "disputed" but is clearly undisputed by the record evidence, the Court will consider the fact to be undisputed.

charge of all medical decisions on all the horses, and whether she controls the money. [Joint Parties' SMF ¶ 7]. The parties do agree, however, that Katie was involved with the transaction at issue in this case. [Joint Parties' SMF ¶ 96].

Katie Monahan, Inc. ("KMI"), is a Virginia S Corporation formed in 1984; the sole shareholder of KMI is Katie Prudent and Katie Prudent is the President of KMI. [Joint Parties' SMF ¶ 5]. The parties dispute KMI's involvement in the transaction at issue in this case. [Joint Parties' SMF ¶ 5-7].

Defendants are residents of California. [Defendants' SMF ¶ 1]. Paul's business, TriStar, is located near San Diego, California. [Defendants' SMF ¶ 1]. Paul has been a professional horse rider and trainer for more than forty years. [Joint Parties' SMF ¶ 10]. Paul had known Katie and her assistant for many decades. [Defendants' SMF ¶ 16]. Paul first met Katie in the 1970s when Paul came to ride at the same barn as Katie. [Joint Parties' SMF ¶ 29].

Nicole Haunert ("Nicole"), Paul's daughter-in-law, is a professional rider and trainer who has worked with Paul as a professional rider and assistant trainer for several years. [Joint Parties' SMF ¶ 11; Defendants' SMF ¶ 10; DE 116 ¶ 19].

Zume was born in 1996, has been riding horses since she was five years old, and is an amateur equestrian. [Joint Parties' SMF ¶ 8; Defendants' SMF ¶ 2]. Cindy Gallaher ("Cindy") is Zume's mother. [Joint Parties' SMF ¶ 9]. Zume has been Paul's client for many years. [Defendants' SMF ¶ 4]. Although Paul is commonly referred to as a "horse trainer," the scope of his responsibilities for Zume (and his other clients) goes beyond training horses. [Defendants' SMF ¶ 5]. Paul coaches Zume as a rider in the equestrian discipline known as "jumpers." [Defendants' SMF ¶ 5]. Paul is charged with the care and management of Zume's horses. [Defendants' SMF ¶ 5]. He also locates, evaluates, and advises Zume in her purchase, sale, and

lease of horses. [Defendants' SMF ¶ 5].

Zume first came to ride and train with Paul in 2015, and from that time forward, Nicole assisted Paul with the training of Zume and Zume's horses. [Joint Parties' SMF ¶ 12]. At all times relevant to this case, Zume trusted Paul and Nicole. [Joint Parties' SMF ¶ 21].

    b.  <u>A horse for Zume</u>

Paul represented Zume as her agent in the at-issue transaction to purchase Victorio. [Joint Parties' SMF ¶ 16; DE 116 ¶ 15]. Zume agreed to pay Paul a 10% commission in exchange for representing Zume as her agent in the purchase of Victorio. [Joint Parties' SMF ¶ 17]. Zume relies on the opinion of her professional horse trainers, Nicole and Paul, to assesses whether or not a horse is suitable for her to ride and compete. [Joint Parties' SMF ¶ 25]. Paul knew that part of his job duties in representing Zume with the purchase of a horse would be utilizing his skills as a professional, along with the skills of Nicole as an assistant professional, to evaluate the abilities of a horse and whether the particular horse would be a good fit for Zume. [Joint Parties' SMF ¶ 27]. As Zume's trainer, Paul is in the best position to make a suitability determination as to Zume. [Defendants' SMF ¶ 38].

By March 2018, Zume had trained with Paul and Nicole for three years. [Joint Parties' SMF ¶ 19]. Prior to the transaction involving Victorio, in March 2018, Paul and Nicole had previously assisted Zume with the purchase of two other horses. [Joint Parties' SMF ¶ 20].

On March 5, 2018, because there were no horses within Paul and Nicole's barn that were candidates for what Zume was looking for, Defendants along with Cindy and Nicole traveled to Florida to look at horses for Zume to potentially purchase. [Joint Parties' SMF ¶ 22; Defendants' SMF ¶ 10]. The purpose of the March 2018 trip to Florida was to see if the Gallahers and Haunerts "…could find a horse that [Zume] could safely ride that would be suitable for her to

move up to the Grand Prix level meter 50, meter 60 jumping, which she hadn't done previously." [Joint Parties' SMF ¶ 23; Defendants' SMF ¶ 11].

By March of 2018, Paul had not seen or otherwise been in touch with Katie for at least twenty years. [Joint Parties' SMF ¶ 30]. Neither Zume nor Cindy had ever met Katie prior to March of 2018 when Zume came to Florida to find a suitable horse. [Joint Parties' SMF ¶ 34].

William Martin ("Martin") is a horse professional in California. [Defendants' SMF ¶ 13]. In early 2018, Martin told Paul about horses, including Victorio, offered for sale by Plain Bay that he thought would be suitable for Zume and would satisfy Paul's requirements for a suitable horse for Zume. [Defendants' SMF ¶ 14; Joint Parties' SMF ¶ 31].   Paul was not sure if he wanted to see Victorio when Martin told him about the Horse. [Joint Parties' SMF ¶ 33]. But ultimately, Defendants along with Cindy and Nicole visited and evaluated Victorio on two separate occasions during their trip to Florida, during which both Nicole and Zume test rode Victorio. [Joint Parties' SMF ¶ 40]. The first occasion was on March 6, 2018 and the second was on March 7, 2018. [Joint Parties' SMF ¶ 40, 42, 44].

   c.   March 6, 2018 trial ride of Victorio

On the afternoon of March 6, 2018, the group met with the Joint Parties at the Plain Bay facility in Wellington, Florida for a trial ride of Victorio. [Defendants' SMF ¶ 20]. The parties dispute which party was represented to Defendants to be the owner of the Horse. *See, e.g.,* Defendants' SMF ¶ 22.

On March 6, 2018, prior to riding Victorio, Katie showed the Gallahers and Haunerts several videos of Victorio competing. [Joint Parties' SMF ¶ 37]. The nature of what the videos showed and represented and what statements were made while viewing the videos are disputed. *See, e.g.*, Defendants' SMF ¶ 21. Also, prior to riding Victorio, Katie provided Defendants with

Victorio's United States Equestrian Federation, Inc. ("USEF") records. [Joint Parties' SMF ¶ 39]. The parties dispute whether the Defendants were provided with the full and complete USEF report. [Joint Parties' SMF ¶ 39].

On March 6, 2018, Nicole and Zume first each test rode Victorio. [Joint Parties' SMF ¶ 42]. Nicole rode the Horse first to see "if she felt that it might be a good fit for Zume, then Zume would get on the horse." [Joint Parties' SMF ¶ 41]. The parties dispute how Zume's first ride went. *See, e.g.*, Defendants' SMF ¶ 23. Nevertheless, the Gallahers and Haunerts came back the next day to have Nicole and Zume ride the Horse for a second time. [Defendants' SMF ¶ 23-24].

d.   March 7, 2018 trial ride of Victorio

The next day, on March 7, 2018, Nicole test rode Victorio for a second time and "[s]he rode it beautifully" and "[l]oved it." [Joint Parties' SMF ¶ 43]. Zume also test rode Victorio for a second time, and she rode Victorio beautifully and Defendants and Nicole were satisfied with the Horse. [Joint Parties' SMF ¶ 44]. Paul testified that Zume rode Victorio the second time "[l]ike a pro." [Joint Parties' SMF ¶ 45].

At the conclusion of the second trial of Victorio on March 7, 2018, Paul thought the Horse was a good option for Zume and he advised Plain Bay of their interest in Victorio pending the results from a pre-purchase examination of the Horse by a veterinarian. [Defendants' SMF ¶ 25-26; Joint Parties' SMF ¶¶ 47-49].

e.   Pre-purchase examination of Victorio

On March 9, 2018, a veterinarian engaged by Defendants, Dr. Jorge Gomez, conducted a pre-purchase examination of the Horse. [Defendants' SMF ¶ 27; Joint Parties' SMF ¶ 50]. The parties do not dispute that Dr. Gomez asked several specific questions about the Horse's veterinary history and was told that the Horse had never been "treated for EPM," did not have

"any history of respiratory problems," did not have "a history of recurring lameness" and did not have "any other pertinent medical history." [Defendants' SMF ¶ 27].   The parties also do not dispute that, at the time of the examination and report, the result of the pre-purchase examination of the Horse by Dr. Gomez was satisfactory to Paul, Nicole, Cindy, Zume, and Dr. Vazquez (Zume's primary California based veterinarian). [Joint Parties' SMF ¶ 50]. However, the parties dispute whether the Joint Parties gave Dr. Gomez an accurate and complete medical history of the Horse and accurate and complete information in response to his pre-purchase examination questions. *See, e.g.*, Defendants' SMF ¶¶ 56-66. As a result of these factual disputes, the parties disagree as to whether the pre-purchase inspection of the Horse was accurate or whether the pre-purchase inspection was as a result of inaccurate or incomplete medical information about the Horse.[6] *See, e.g.*, Defendants' SMF ¶¶ 56-66.

    f.   The at-issue transaction and request for the return of the money

Based on the entire pre-purchase inspection of the Horse, including Paul and Nicole's vetting, the two trial rides by both Nicole and Zume, and the veterinary pre-purchase examination, Defendants decided to purchase Victorio. [Joint Parties' SMF ¶ 54]. Initially the sale price for Victorio was $1,000,000, and a final negotiated purchase price of $950,000 was agreed upon. [Joint Parties' SMF ¶ 55].

Plain Bay prepared and transmitted a Bill of Sale for the Horse to Zume on March 15, 2018 for the purchase price of $950,000. [Defendants' SMF ¶ 28]. The Bill of Sale was signed

---

[6] For example, Defendants contend that, "During the pre-purchase exam, Dr. Gomez asked, 'Is there any history of respiratory problems, COPD, or bleeding?' and was told 'No.'" [DE 460 ¶ 57]. According to Defendants, this response "was inaccurate given Victorio had bronchopneumonia in as shown in the Horse's 2016 prepurchase exam." [DE 460 ¶ 57].   The Joint Parties respond that this fact is disputed because, *inter alia*, the question "in the context of a prepurchase exam could easily be understood to mean 'has this horse – [horse had] ongoing respiratory problems since it's been in your care?' in which case the answer to the question would reasonable [sic] be 'no.'" [DE 484 ¶ 57 (quotation altered to reflect the accurate quote from Tim Ober's testimony per DE 484-20 at 215)].

by Zume the same day. [Defendants' SMF ¶ 29].  Plain Bay received the purchase price via wire transfer in the late afternoon of March 15, 2018. [Defendants' SMF ¶ 30].  There were no restrictions or conditions precedent to release of the $950,000. [Joint Parties' SMF ¶ 57].

Plain Bay does not post a "no refund" sign at its location. [Defendants' SMF ¶ 31].  The Bill of Sale does not include language indicating Plaintiff had a "no refund" policy. [Defendants' SMF ¶ 32].

At Paul's direction, Plain Bay arranged a flight for the Horse from Florida to California, which was scheduled to depart on March 18, 2018.  [Joint Parties' SMF ¶ 56; Joint Parties' SMF ¶ 51].

Around 8:00 a.m. on March 16, 2018, the day after Zume signed the Bill of Sale and paid Plain Bay the full purchase price, a friend of the Haunerts and horse trainer, Craig Yates, approached Nicole at the horse show in Thermal, California, and asked "…did you not do your homework[,]" in regards to the Horse. [Joint Parties' SMF ¶ 61; Defendants' SMF ¶ 34].  After Yates spoke with Nicole, she went to find Paul. [Joint Parties' SMF ¶ 63].  The Haunerts then "…went to find a couple other people to get their opinions [of the Horse]." [Defendants' SMF ¶ 35]. Nicole testified she spoke with six individuals who could offer an opinion about the Horse and the parties dispute whether the opinions of the Horse were all negative. [*See, e.g.*, Defendants' SMF ¶ 35]. Then Nicole received two videos—one of the videos showed a horse that went through a fence and fell down and the other video showed Adam pulling a horse's head up. [Defendants' SMF ¶ 36]. According to Paul, the video of Adam pulling on the horse and the head up is "…the one that bothered me the most." [Joint Parties' SMF ¶ 66].

According to Paul, watching the videos made him recall an incident with Nicole during the trial of the Horse, which made him decide "to go and start asking questions about people who

have known the [H]orse" to determine if the videos showed an anomaly. [DE 460-1 at 230].

According to Paul, "Watching those videos and talking to people, I knew absolutely,

unequivocally, without a doubt, that that was the wrong horse for [Zume] and it was dangerous

for [Zume]." [Joint Parties' SMF ¶ 70].

Later that day, Zume and Cindy met Paul and Nicole at the Thermal horse show. [Joint

Parties' SMF ¶ 69]. The parties agree that Paul and Nicole showed Zume and Cindy videos of

the Horse, but dispute whether the "wrong horse video" was shown to Zume and Cindy. [Joint

Parties' SMF ¶ 69]. At that time, Paul discussed the Horse with Zume and Cindy, but the parties

dispute whether Paul expressed his revised professional opinion about the Horse's suitability for

Zume or whether Paul and Nicole merely relayed what they had heard from others about the

Horse. [Joint Parties' SMF ¶ 69; Defendants' SMF ¶ 37]. After viewing the videos and the

discussion with Paul, Cindy directed Nicole to reverse the transaction and get the purchase price

paid for the Horse back. [Joint Parties' SMF ¶ 71]. Also at Cindy's direction, the Haunerts then

contacted Plain Bay, directing Plain Bay to cancel the planned flight for Victorio to California,

which they did, and Zume never took physical possession of the Horse. [Joint Parties' SMF ¶ 75;

Defendants' SMF ¶ 41].

Adam and Henri were also at the horse show in Thermal, California, and met with Paul

and Nicole in the afternoon of March 17, 2018 and again on March 18, 2018. [Defendants' SMF

¶ 39]. During the meeting with Henri and Adam, Paul demanded the return of the purchase price

and contended that the Horse had been misrepresented. [Defendants' SMF ¶ 40].

On March 17, 2018, Zume received a letter from Katie, which was addressed to

Defendants and Zume's parents, in order to, *inter alia*, "tell you everything I know about

Victorio since he arrived at our farm from Europe in June 2016."[7] [DE 116-2; *see* Defendants' SMF ¶ 42]. The letter also addressed Defendants' concerns about the Horse "stopping." [DE 116-2; *see* Defendants' SMF ¶ 42]. The letter also stated that, "I have been told that you are now asking for your money back on your purchase of Victorio. The deal has been completed, the Bill of Sale has been signed, the money has been transferred. I would like for you to explain to me why you want to unravel the deal[.]" [DE 116-2; *see* Defendants' SMF ¶ 42].

On March 20, 2018, Katie sent a letter to Zume's parents. [DE 484-8 at 4-8]. The letter explains, *inter alia*, that one of the videos Paul was shown was not Victorio and that Katie informed Paul of this. [DE 484-8 at 4-8]. It explains the information that was given to Paul and Nicole during the March visit and explains that Victorio's complete jumping history was readily available to anyone for viewing online. [DE 484-8 at 4-8]. The letter also acknowledges that "Paul has said that you want Plain Bay Sales to give you your money back[,]" and explains the "due diligence" by Defendants and Nicole of Victorio prior to purchase. [DE 484-8 at 4-8]. The letter states that Katie is "awaiting further instructions from you regarding what to do with your horse" and that Katie seeks "a couple of good options where we can go from here and [Katie] would be happy to talk to you by phone or email." [DE 484-8 at 4-8].

On April 29, 2018, Katie emailed Zume's mother with the subject line "one last try[,]" which asks again to speak about the matter. [DE 484-8 at 7-8]. Katie explains, *inter alia*, that she is not the sole owner of Victorio. [DE 484-8 at 7-8]. "I have investors who are businessmen, and they say that they don't want to give the money back, that this is not the way normal business affairs are done." [DE 484-8 at 7-8].

On May 3, 2018, Plain Bay initiated this lawsuit against Defendants. [DE 1]. On June 8,

---

[7] The letter is dated March 15, 2018, which appears to be a scrivener's error given that it is undisputed that Defendants did not request the purchase price be refunded until March 16, 2018.

2018, Plain Bay sent a letter to Zume advising that the Horse would be sold to someone else, but the parties dispute the legal effect of this letter. [Defendants' SMF ¶ 52]. In July 2018, Victorio was sold to The Victorio Equine Group LLC for $500,000. [Defendants' SMF ¶ 53]. On October 18, 2018, Plain Bay sent a check payable to Zume in the amount of $455,647.50. [Defendants' SMF ¶ 55].

IV.     **DISCUSSION AND ANALYSIS**

A.  **Plain Bay's Complaint [DE 256]**

1.  **Standing**[8]

As a preliminary matter, Defendants move for summary judgment on all of the remaining claims in Plain Bay's Complaint arguing that Plain Bay lacks standing.

The Court disagrees. To establish standing, Plain Bay "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Bloomgarden v. Allstate Fire & Cas. Ins. Co.*, 499 F. Supp. 3d 1160, 1164 (S.D. Fla. 2020). When standing is raised during the summary judgment stage, the plaintiff must put forth evidence, to be viewed in the plaintiff's favor, to meet the increased burden. *Id.* at 1164–65. The Supreme Court has determined that, to establish an injury in fact, the plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Specifically, a "concrete" injury must be "de facto," meaning that "it must actually exist." *Id.* (citation and internal quotation marks omitted).

---

[8] The Court has carefully reviewed Defendants' Request for Judicial Notice in Support of Motion For Summary Judgment [DE 529], the response in opposition [DE 530], and the reply [DE 531]. The Motion [DE 529] is GRANTED.  For the purposes of summary judgment, the Court will take judicial notice of the 2018, 2019, 2020, 2021 and 2022 versions of USEF Rule GR1102 "Horse Recordings" for the limited purpose that, "The Federation's horse recording records are not a title registry and the Federation does not decide, otherwise resolve, or become involved in ownership disputes."

As for the injury being "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* (citation and internal quotation marks omitted).

Here, there is evidence in the record that Plain Bay was the owner of Victorio from the moment the Horse was purchased in 2016 and that Plain Bay signed the Bill of Sale for Victorio. Plain Bay has an interest in Victorio, and injury to those interests can be resolved by a finding in the favor of Plain Bay. Moreover, Defendants brought their own contract claims based upon breach of warranty against Plain Bay. The Court easily finds that Plain Bay has standing on the remaining claims in Plain Bay's Complaint.

## 2.   Counts 1, 2, and 3: Breach of Contract claims against Defendant Zume

Counts 1, 2, and 3 of Plain Bay's Complaint against Defendant Zume sound in contract, alleging three alternative theories, for attempt at revocation of acceptance (Count 1), attempt at rejection (Count 2), and wrongful repudiation and rescission (Count 3). Zume and Plain Bay filed competing motions for summary judgment on these counts, arguing entitlement to summary judgment in their respective favor.

The Court finds that the parties have not met their respective burdens, as there are genuine issues of material fact concerning Plain Bay's contract claims precluding summary judgment. Here, the facts and circumstances surrounding the Victorio transaction, including whether Plain Bay lacks any damages as a result of the contract counts, are material to this case and hotly disputed. Given the conflicting evidence presented by the parties, the Court cannot determine as a matter of law that Zume wrongly attempted revocation of acceptance, wrongly attempted rejection, wrongfully repudiated and rescinded the contract, or that either Zume or Plain Bay acted reasonably or unreasonably here. There are factual disputes preventing summary judgment as it relates to the Victorio transaction, and the facts and circumstances surrounding

this issue will be determined by the trier of fact after it has the opportunity to consider all the relevant evidence and the opportunity to make credibility determinations at trial.

In sum, this is a jury question and will not resolved by the Court on summary judgment. *See Yacht Ventures, Ltd. v. Glob. Marine Group, LLC*, 07-61385-CIV-DMM, 2008 WL 2949475, at *5 (S.D. Fla. July 30, 2008) ("Under Florida contract law, the question of what constitutes a reasonable time is generally a question of fact."); *see also Absolute Trading Corp v. Pdvsa Servs., Inc*., No. 10-21371-CIV, 2011 WL 13115435, at *6 (S.D. Fla. Oct. 5, 2011); (finding disputed facts as to reasonableness under the UCC is a question for the jury); *Twin Rivers Eng'g, Inc. v. Pacer USA, LLC*, 257 So. 3d 140, 142 (Fla. 4th DCA 2018) (same); *Ballas v. Spolyar*, 548 So. 2d 1168, 1169 (Fla. 2d DCA 1989) (same). Accordingly, both motions for summary judgment of the parties in their respective favor as to Counts 1, 2, and 3 are denied, and the jury will determine these contract theories at trial.

### 3. Counts 6 and 9: Claims related to Defamation by False Implication against Defendants

As an initial matter, Defendants assert that California law applies to Plain Bay's defamation claim against Paul. Plain Bay argues that Defendants' choice-of-law argument is waived for failing to raise it prior to summary judgment.

The Court agrees that the choice-of-law argument has been waived by Defendants. It is true that in a June 21, 2019 ruling the Court considered Plain Bay's Motion to Strike certain California-based Affirmative Defenses [DE 81], and the Court allowed that the factual basis for invoking California law would have to be uncovered during discovery and could be raised "[a]fter the close of discovery, and after the factual record is fully developed . . . either through a timely motion for summary judgment or a timely motion to determine choice of law." [DE 122 at 6-7; DE 127]. However, Defendants did not thereafter raise California law with respect to the

defamation claim. [DE 199, Defendants' Motion to Dismiss the Second Amended Complaint]. At no point in any subsequent pleading or in motion practice did the Defendants do more than make general references to California law again.

When Defendants moved, on April 17, 2020, to dismiss the Third Amended Complaint [DE 275], Defendants relied solely upon Florida and Eleventh Circuit case law with respect to the defamation claim and did not invoke California law at all. [DE 275 at 8-9]. When the Court denied Defendants' Motion to Dismiss the defamation claim of the Third Amended Complaint over a year ago, on September 25, 2020, the Court did so solely under Florida law. [DE 323 at 7-8]. Defendants did not then object to the application of Florida law. Conversely, when the Court invoked Florida law in dismissing the tortious interference claim but preserving the defamation claim in the same Order [DE 323 at 3-7], Defendants did not complain of the application of Florida law. The Court finds that Defendants waived their right to now invoke California law in summary judgment. *See Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197 (11th Cir. 2018); *see also Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) ("Unlike subject-matter jurisdiction—which a court must always consider, and which can neither be waived nor acceded to—the parties can stipulate to (or waive) the law that will govern the various claims or issues in a federal diversity case."); *Goodnight v. Boston Sci. Corp*., 18-62370-CIV, 2020 WL 6873737, at *4–5 (S.D. Fla. Nov. 23, 2020) (collecting cases). Defendants have clearly acquiesced in the application of Florida law in this case, and they have also waived their argument that California law should apply.

Turning to the merits, Defendants and Plain Bay both move for summary judgment on Plain Bay's defamation claim against Paul, respectively arguing that the claim fails or succeeds as a matter of law.  However, the Court notes that Plain Bay also contradicts its own argument

for summary judgment in its favor in its response to the Defendants' motion for summary judgment and asserts that Plain Bay's "claim of defamation by implication is uniquely suited for trial" and there is no "absence of a genuine issue of fact as to whether or not defamation by implication has occurred." *See, e.g.*, DE 483 at 18. Regardless of Plain Bay's wavering position on its defamation count, the Court finds that the record evidence does not create a genuine issue of material fact as to Plain Bay's Count 6 of defamation by implication against Paul and summary judgment is due to be granted in favor of Paul and against Plain Bay on Count 6. As a result, Plain Bay's related vicarious liability claim, Count 9 against Zume, where Plain Bay seeks to hold Zume liable for the alleged defamation, also fails as a matter of law.

Defamation under Florida law requires the plaintiff to show that the defendant (1) published a statement to a third party about the plaintiff; (2) the statement was false; (3) the statement caused actual damages to the plaintiff and (4) the statement is defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). The statement must be capable of a defamatory effect, i.e., a "false statement which naturally and proximately result[s] in injury to another." *Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 704–05 (Fla. 3d DCA 1999). "Defamatory statements 'tend to subject someone to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession.'" *Astro Tel, Inc. v. Verizon Florida, LLC*, 979 F. Supp. 2d 1284, 1300–01 (M.D. Fla. 2013) (quoting *American Airlines, Inc. v. Geddes*, 960 So.2d 830, 833 (Fla. 3d DCA 2007)). "To determine whether a statement is defamatory, it must be considered in the context of the publication." *Smith*, 731 So. 2d 702 at 704. Such a statement "is not actionable until it is published or otherwise disseminated to someone other than the claimant." *Astro Tel, Inc.*, 979 F. Supp. 2d at 1301. "The court has a 'prominent function'" in determining whether a statement is defamatory, and if

a statement is not capable of a defamatory meaning, it should not be submitted to a jury.'" *Smith*, 731 So. 2d at 704 (citations omitted); *see also Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018); *Rubinstein v. Ourian*, 20-21948-CIV, 2021 WL 4134753, at *5 (S.D. Fla. Sept. 10, 2021).

Florida recognizes a cause of action for defamation by implication. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1098 (Fla. 2008). "Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts[.]" *Klayman v. Judicial Watch, Inc*., 22 F. Supp. 3d 1240, 1254 (S.D. Fla. 2014) (citing *Jews for Jesus*, 997 So. 2d at 1106).

In Count 6, Plain Bay alleges that Paul juxtaposed images of Victorio to intentionally create a false impression of the lack of ability of the Horse and unsuitability of the Horse for Zume and of a reputation for untruthfulness of Plain Bay in the Victorio transaction. [DE 256 ¶ 112]. Count 6 alleges two "publications" of defamatory statements by implication: 1) Paul showed the videos to Zume's mother, Cindy, which implies a defamatory statement that the videos accurately portrayed the unsuitability of the Horse for Zume; and 2) Paul also later circulated the second video to "third parties around the World, which were then brought to the attention of Plaintiff by one of those third parties," when one of the horses depicted was not Victorio. *Id.* ¶ 113. Plain Bay alleges that showing these videos was defamatory because they "were not full videos of the competition rounds from which they were taken, were shown in the context of the hundreds of fences and rounds of successful competition by Victorio, were of competitions taken between six months prior and over a year prior to the March 15, 2018 purchase and sale and thus did not reflect the present abilities of the Horse, and omitted explanation of the context of rider error and of the continued, successful training and

development of Victorio after those images were taken." *Id.* ¶ 115. Plain Bay asserts that "[Paul] further created by publication a defamatory implication as to the abilities and suitability of the Horse for [Zume], and of the business reputation of Plain Bay, by omitting facts of the competition successes of Victorio and of the rider error causing the very limited images published to [Cindy]." *Id.* ¶ 116. The videos created a "defamatory impression, inference, implication and innuendo that Victorio was an incapable and unsuitable horse for [Zume] and that Plain Bay was an untruthful seller of the Horse." *Id.* ¶ 117. They also implied that "Victorio had not successfully cleared all prior fences at all competitions." *Id.* ¶ 119.

To begin, there is a lack of evidence of a "worldwide" dissemination of the videos by Paul. Plain Bay only puts forth two pages of Katie's deposition as the evidence to support that "one of the videos was sent to an individual in Belgium by an individual in California who had learned from [Paul] of [Zume] breaking the deal and 'the horse being a bad horse.'" [DE 484, Plain Bay's Counter-Statement of Material Facts ¶ 50 (citing Deposition of Katie Prudent 444:21-446:10)]. Upon review of the cited deposition transcript, there is a lack of sufficient evidence to support Plain Bay's position that Paul sent or showed videos to anyone other than Zume and Cindy. When asked if the individual in California got the video from Paul, Katie said "No." [Deposition of Katie Prudent 446:11-12]. Because of the lack of evidence to support Plain Bay's alleged "worldwide" publication, that theory of Count 6 fails as a matter of law.

As to Plain Bay's alleged theory that Paul published a defamatory statement by implication when he showed videos to Zume's mother, Cindy, this theory also fails as a matter of law. Florida courts recognize a qualified privilege in defamation cases based on a mutuality of interest in the statement between the speaker and listener. *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1264 (S.D. Fla. 2004). "The essential elements of the qualified

privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner." *Id.* (citing *Thomas v. Tampa Bay Downs, Inc.,* 761 So.2d 401, 404 (Fla. 2d DCA 2000)). Given the record evidence, the Court finds that showing videos to Zume's mother, who had traveled to Florida with Zume for the purpose of finding a suitable and safe horse for Zume and who was heavily involved in the transaction at issue, meets the requirements for the privilege, which was properly raised by Defendants' affirmative defenses and similarly argued on summary judgment.[9]

The Court also finds that there is a lack of record evidence that the videos sufficiently communicated a defamatory statement by implication about Plain Bay and their reputation.  In viewing the evidence in a light most favorable to Plain Bay, the videos arguably communicated a false statement that the Horse demonstrated behavior that was not suitable or safe for Zume, and had Paul presented an accurate depiction of the Horse, the Horse was in fact suitable and safe for Zume.  Considering the context of the publication, however, it is a tortured view of the record evidence to find that the videos (the alleged implied statement that the Horse was not suitable and safe for Zume) are evidence of a defamatory statement by implication of *Plain Bay and their reputation*. Because there must be more than just a metaphysical doubt as to the material facts, Plain Bay's theory that Paul published a defamatory statement by implication about it when he showed videos to Zume's mother fails as a matter of law.

In sum, the record taken as a whole could not lead a rational trier of fact to find for Plain Bay on Count 6 or 9, and summary judgment is granted in Defendants' favor on these two counts. In light of this ruling, Plain Bay's request for punitive damages in Count 1 of its

---

[9] Although the affirmative defenses were brought under California law, the Court finds that qualified privilege in defamation cases based on a mutuality of interest was sufficiently asserted under Florida law. *See* DE 332.

Complaint based upon the alleged defamation is stricken. *Barrakuda Ltd. v. Zazaby Jewels, Inc.*, 19-23004-CV, 2021 WL 2454467, at *5 (S.D. Fla. May 14, 2021) (citing *Lewis v. Guthartz,* 428 So. 2d 222, 223 (Fla. 1982) ("It is now a well-settled rule in Florida that punitive damages are not recoverable in a breach of contract action, absent an accompanying independent tort.")).

## B. Defendants' Counter-Complaint [DE 116]

### 1. <u>KMI</u>

The Joint Parties argue that summary judgment in favor of KMI is now appropriate because there is no dispute that KMI has nothing to do with the purchasing and/or sales of horses. Accordingly, the Joint Parties argue that summary judgment should be entered in KMI's favor as to the four counts alleged against it.

The Court disagrees. The Joint Parties have not met their burden as there are genuine issues of material fact as to KMI's involvement with the transaction. For instance, there is evidence in the record that both KMI and Katie are involved in the purchasing and/or sales of horses. [DE 460-11, 29:6-12; DE 460-9, 120:6-23, 646:2-13, 646:14-647:5]. Katie has confirmed during deposition that "KMI is basically me" and that KMI simply collects money related to Katie's horse business. [DE 460-9, 81:16, 77:15-19; 81:7-16; 708:21-709:8].  There is evidence that KMI was involved in the transaction in this case. [DE 460-11, 279:13-272:20]. KMI received money for its services when the Horse was resold. [DE 460-9, 524:17-22; 683:20-684:1; 694:3-6; 702:18-703:7; 705:2-25]. There is also evidence in the record that KMI took money directly from Zume's escrowed purchase price because "Katie needed it." [DE 460-9, 482:14-18, 677:7-678:14]. The Court finds that there is sufficient evidence in the record of KMI's involvement in the case and summary judgment based upon the position that KMI had no involvement with the transaction fails as a matter of law. The Court will therefore address the

merits of the summary judgment arguments as they relate to the counts against KMI, *infra*.

**2.  Counts 3, 4, 5, and 11: Contract and related equitable claims against Plain Bay**

Plain Bay argues for summary judgment in its favor as to the contract counts and related equitable counts against it—Count 3 alleges Breach of Express Warranty; Count 4 alleges Breach of Implied Warranty of Fitness For a Particular Purpose; Count 5 alleges Breach Of Implied Warranty of Merchantability; and Count 11 alleges Recission.

### i.  *Contract claims brough by Defendant Paul*

Plain Bay argues that summary judgment should be granted in its favor as to the contract claims brought against it by Defendant Paul because Paul is not in privity of contract and does not meet the criteria to qualify as a non-privity third-party beneficiary. Defendant Paul contends that by virtue of Paul's position as Zume's agent, his third-party beneficiary status to the contract, and because he is not a stranger to the contract, he need not have signed the contract to be able to bring contractual claims against Plain Bay.

The Court agrees with Paul. For example, under Florida Law, "[a] seller's warranty whether express or implied extends to any natural person who . . . is an employee, servant or agent of his or her buyer if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." § 672.318, Fla. Stat.; *see also Kramer v. Piper Aircraft Corp*., 520 So. 2d 37, 39 (Fla. 1988) (privity of contract not required in cases "which fall within the scope of § 672.318, Fla. Stat. [], of the Florida Uniform Commercial Code."). While it is true that the parties that signed the Bill of Sale are Zume and Plain Bay, Paul was an agent for Zume and not a stranger to the Horse transaction. Moreover, it was reasonable to expect that Paul would use and be affected by the Horse by riding and training the Horse for Zume. As such, the Court will address the merits of the contract

claims and related claims brought by both Defendants.

*ii.   Count 3: Express Warranties*

Plain Bay first argues that "express warranties which are not incorporated into a written contract may not somehow be supplemented to the terms and conditions of an otherwise complete and enforceable contract." [DE 455 at 26].   Plain Bay offers no legal authority to support its position, and the Court finds it to be without merit. In fact, with regard to the creation of express warranties, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." § 672.313(1)(a), Fla. Stat. Because there is no requirement that the Bill of Sale or written contract contain the warranties the buyer seeks to enforce, summary judgment is not warranted on that basis.

Plain Bay next argues that "mere opinions do not create express warranties" [DE 455 at 26], and that "[a]part from the statements by Katie Prudent, that in her opinion, Victorio was an easy horse to ride that could take an inexperienced rider successfully into the Grand Prix ring, there is no evidence that Katie Prudent, Plain Bay Sales, or any of the Plain Bay Parties made additional statements or representations about the suitability of the Horse for Zume Gallaher." [DE 455 at 26].

The Court finds that Plain Bay has not met its burden on summary judgment and there is sufficient evidence in the record for this issue to be determined by a jury.   For example, there is evidence in the record that Plain Bay was aware of the specific requirements for the horse, including a horse that could move Zume up to the next levels of show jumping and jump courses at 1.50 to 1.60 meters in size, a horse that would tolerate rider errors and safely jump at the higher levels without overreacting or engaging in dangerous behavior in response to rider errors,

a horse that could safely "pack" Zume around at the higher levels, a horse that had previous success and experience at the 1.50-1.60 meter competition level, a horse that was easy to ride with a "light and "uphill" manner of going, a horse that was suitable for Zume's small stature, a horse that possessed the necessary athletic ability but had the right temperament and disposition to tolerate an amateur rider at these higher levels, a horse that was not particularly large and one that of course could not have any issues or problems. *See, e.g.*, DE 460-1, 283:2-284:19; DE 460-4, 118:13- 22; DE 460-8, 200:1-201:25; DE 460-9, 187:4-190:12.

The Court finds that there are material issues of fact regarding what statements were communicated as to the requirements of the Horse, what warranties were made regarding the Horse, what these statements and alleged warranties mean in the context of purchasing a sport horse, whether any warranties were breached, and whether any such breach resulted in damages. The communications and understandings between the parties as they related to the Horse transaction within the appropriate context are central to this case, genuinely disputed, and the merits of the allegations in Count 3 will be determined by a jury after it has the opportunity to consider all the relevant evidence and the opportunity to make credibility determinations at trial.

### iii.  *Counts 4 and 5: Implied Warranties*

Plain Bay argues that both counts of implied warranties fail for lack of reliance, the use in the trade in the industry precludes implied warranties governing behavioral proclivities of a horse, and because there was an opportunity to inspect the Horse prior to purchase. [DE 455 at 27-30].

There are two distinct implied warranties at issue here: an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. The warranty of merchantability is implied in any contract for the sale of goods, "if the seller is a merchant with

respect to goods of that kind." § 672.314(1), Fla. Stat. In order for goods to be merchantable, the goods must be "fit for the ordinary purposes for which such goods are used," among other requirements. § 672.314(2)(c), Fla. Stat. By contrast, the implied warranty of fitness for a particular purpose arises only when "a seller has reason to know a particular purpose for which the goods are required and the buyer relies on the seller's skill or judgment to select or furnish suitable goods." *Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Manufacture Co. Ltd*., 142 F. Supp. 3d 1245, 1254 (M.D. Fla. 2015) (quoting *Royal Typewriter Co. v. Xerographic Supplies Corp*., 719 F.2d 1092, 1100 (11th Cir. 1983)). Under those circumstances, an implied warranty arises "that the goods shall be fit for such purpose." § 672.315, Fla. Stat. "The implied warranty of fitness for a particular purpose may, however, be excluded or modified in certain circumstances." *Zendejas v. Redman*, 15-81229-CIV-MARRA, 2016 WL 1242349, at *4 (S.D. Fla. Mar. 30, 2016) (citations omitted).

The Court finds that there are genuine material issues of fact as to Count 4, breach of implied warranty of fitness for a particular purpose, and summary judgment should be denied as to that Count. However, the Court finds that summary judgment is due to be granted in Plain Bay's favor as to Count 5, breach of implied warranty of merchantability, because the undisputed facts establish that Plain Bay did not breach the implied warranty of merchantability as a matter of law.

As to Count 4, implied warranty of fitness for a particular purpose, Plain Bay has not met its burden on summary judgment for the same reasons that it failed to meet its burden as to the alleged express warranties, *supra*. For instance, whether and to what extent the particular purpose was discussed with Plain Bay, whether their pre-purchase conversations gave rise to an implied warranty which may have been breached, and whether any such breach caused damages,

will all be determined by a jury. The Court also finds that whether and to what extent Defendants relied upon Plain Bay's skill and judgment in the Horse transaction is also highly disputed by the parties. Moreover, the argument that any implied warranty of fitness for a particular purpose has been waived due to the pre-purchase inspection is not convincing on these facts. It is true that section 672.316(3)(b), Florida statutes, provides that an implied warranty does not attach "[w]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he or she desired or has refused to examine the goods, there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him or her." § 672.316(3)(b), Fla. Stat. However, the facts and circumstances surrounding the sufficiency of the pre-purchase inspection and whether Defendants should have discovered any alleged defects are highly disputed in this case and will be determined by the trier of fact after it has the opportunity to consider all the relevant evidence and the opportunity to make credibility determinations at trial. Summary judgment is not warranted on Count 4.

As to Count 5, breach of implied warranty of merchantability, the Court finds that Plain Bay has sufficiently met its burden and summary judgment should be granted in its favor on this Count. The Complaint asserts that Plain Bay breached the implied warranty of merchantability to Defendants because the Horse was not suitable to "safely 'pack' a young, petite, female rider inexperienced at 1.50-1.60 meter jumps around competition courses of that size." [DE 116 ¶ 239-241]. The allegations and record evidence surround the particular suitability of the Horse for Zume to ride based upon her specific criteria and requirements tailored for Zume as a rider. However, in order to establish breach of an implied warranty of merchantability, the good must be defective in that it is not fit for the ordinary purposes for which such goods are used. *See Marjam Supply Co. of Florida, LLC v. Pliteq, Inc.*, 15-24363-CIV, 2018 WL 4932871, at *7

(S.D. Fla. Apr. 23, 2018) (setting forth the elements for breach of implied warranty of merchantability). There is no evidence in the record that this was a completely defective horse. In fact, the Horse was ultimately sold for half a million dollars to another buyer. As such, summary judgment is due to be granted on Count 5, as no genuine issues of fact remain for the jury and Plain Bay is entitled to judgment as a matter of law.

### iv. *Count 11: Rescission*

Plain Bay argues that summary judgment should be granted in its favor on Defendants' Count 11 for rescission as rescission is barred as a matter of law because, *inter alia,* the parties cannot be restored to the status quo and Defendants have an adequate remedy at law. The Court agrees.

A claim for rescission requires establishing (1) the parties' relationship or character; (2) a contract; (3) fraud, mistake, false representations, impossibility of performance, or other ground for rescission; (4) that the party seeking rescission actually rescinded the contract and notified the other party; (5) if the moving party received benefits from the contract, it must be established that they attempted to restore those benefits; and (6) no adequate legal remedy exists. *Belaire at Boca, LLC v. Ass'ns. Ins. Agency. Inc*., 2007 WL 2228631, at *4 (S.D. Fla. July 31, 2007).

Here, Victorio was sold to a third-party in July 2018. Moreover, the Horse that existed on March 15, 2018 no longer exists in an unused condition. As the Court will discuss *infra,* a horse, like any living creature, cannot be said to be remain in its original condition after purchase by nature of being alive and the inevitable passing of time.  Because a return to the status quo for the parties is not possible as a matter of law, summary judgment is granted as to this remedy. *See Barber v. Am.'s Wholesale Lender*, 542 Fed. Appx. 832, 836 (11th Cir. 2013) (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.,* 761 So.2d 306, 313 (Fla. 2000) ("A

prerequisite to rescission is placing the other party in status quo.")). Moreover, with the facts now developed in this case, Defendants have an adequate remedy at law available to them for their claims for damages for their breach of express warranty claim and their breach of implied warranty for fitness for a particular purpose claim. Defendants have an adequate remedy at law, "which independently precludes rescission." *Sokolow v. Damico*, 19-CV-80278, 2019 WL 7188563, at *5 (S.D. Fla. Dec. 26, 2019).   Accordingly, Plain Bay is entitled to summary judgment in its favor as to Count 11, rescission.

### 3. <u>Counts 1, 2, and 10: Tort claims against the Joint Parties</u>

The Joint Parties argue that all of the allegations that Defendants used to support their tort claims are barred by the independent tort doctrine and, therefore, summary judgment should be granted in favor of the Joint Parties on Defendants' tort claims against them.

The Court agrees.[10] The independent tort doctrine is "rooted in the notion that, when a contract is breached, the parameters of a claim are defined by contract law, rather than by tort law." *Peebles v. Puig*, 223 So. 3d 1065, 1069 (Fla. 3d DCA 2017). Thus, "to set forth a claim in tort between parties in contractual privity, a party must allege action beyond and independent of breach of contract that amounts to an independent tort." *Reagan Wireless Corp. v. Apto Sols., Inc.*, 18-CV-61147, 2018 WL 4901127, at *3 (S.D. Fla. Oct. 9, 2018) (quoting *Kay v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014)). "Indeed, 'fundamental contractual principles continue to bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations.'" *Reagan Wireless Corp.*, 18-CV-61147, 2018 WL 4901127, at *3 (quoting

---

[10] The Court evaluates this case under the independent tort doctrine and not the economic loss rule, which is not applicable in this case pursuant to *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So.3d 399 (Fla. 2013) and its progeny. *See Prewitt Enters., LLC v. Tommy Constantine Racing, LLC*, 185 So. 3d 566, 569 (Fla. 4th DCA 2016).

*Freeman v. Sharpe Res. Corp.*, 2013 WL 2151723, at \*8 (M.D. Fla. May 16, 2013)) (alterations omitted).

As such, where the misrepresentations are inseparable from the essence of the parties' agreement, the independent tort doctrine applies, and the parties are limited to pursuing their rights in contract. *Inspirations Nevada LLC v. Med Pro Billing, Inc.*, 20-CV-60268, 2021 WL 2156677, at \*6 (S.D. Fla. May 26, 2021); *see also Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1223 (11th Cir. 2018) ("Under Florida law, '[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent cause of action in tort, [where] such misrepresentations are interwoven and indistinct from the heart of the contractual agreement.'" (citations omitted)); *Reagan Wireless Corp.*, 18-CV-61147, 2018 WL 4901127, at \*3 (in determining whether the misrepresentations are distinct from a claim arising under a contract, "the critical inquiry focuses on whether the alleged fraud is separate from the performance of the contract."); *Certified Collectibles Grp., LLC v. Globant, LLC*, No. 8:19-CV-1962-SDM-AEP, 2021 WL 1214963, at \*4 (M.D. Fla. Mar. 31, 2021) ("An alleged fraud is not separate from the performance of the contract [if] the misrepresentations forming the basis for the fraud also form the basis for the breach of contract claim." (internal quotation marks and citations omitted)).

Here, Defendants are essentially seeking enforcement of the bargain, rather than a societal policy or law that gives rise to a duty of care. The counterclaims in Counts 1 (fraud) and 10 (negligent misrepresentation) are indistinguishable from the breach of contract claims in Counts 3 (Breach of Express Warranty) and 4 (Breach of Implied Warranty of Fitness for a Particular Purpose)[11] and thus are not independent torts.

---

[11] As explained *supra*, summary judgment is granted in Plain Bay's favor on Count 5 (Breach of Implied Warranty of Merchantability).

Specifically, in Defendants' breach of contract claims,[12] Defendants allege that they specified certain characteristics and requirements for the prospective horse Zume to have in order to purchase, to wit: that "The Horse was easy to ride"; "The Horse had no issues or problems"; "The Horse was a 'packer' or 'schoolmaster' type horse that would safely 'pack' a young, petite, female rider inexperienced at the 1.50-1.60 meter jumpers around competition courses of that size"; and "The Horse would tolerate mistakes by an amateur rider new to that level of show jumping and would continue to safely jump and complete competition courses of that size, despite mistakes by the rider." *See* DE 116 ¶¶ 199, 219-220, 239-241. There was also "the agreement between [Zume] and Plain Bay Sales that the Horse would meet the particular purpose as communicated to Plain Bay Sales." *Id.* ¶ 221. Defendants were also aware that the Horse had been continuously under the care, custody and control of the Joint Parties and the Joint Parties "had consistently and continuously ridden and shown the Horse in show jumping competitions for more than a year at the time [Zume] and [Paul] evaluated the Horse for purchase and use by [Zume]." *Id.* ¶ 222. As such, Defendants knew that the Joint Parties "were in a position to know everything possible about the Horse's characteristics, traits, habits and temperament when representing the Horse for sale and had a wealth of information about the Horse when they represented, warranted and recommended the Horse for the particular purpose." *Id.* ¶ 222. These promises, warranties and affirmation of facts became the basis for the bargain upon which Zume, through her agent Paul, agreed to purchase the Horse for $950,000.

Counts 1 and 10 require the same proof at trial as the contract claims which all arise out of the specified "requirements" for the Horse to be purchased. Specifically, Count 1 and Count 10 both allege that the Joint Parties misrepresented facts surrounding the Horse regarding

---

[12] "A claim for a breach of warranty is essentially a breach of contract claim[.]" *Certain Underwriters at Lloyd's of London v. Black Gold Marine, Inc.*, 19-23586-CIV, 2021 WL 2653819, at *3 (S.D. Fla. Feb. 8, 2021).

"defects or issues"; "the Horse's suitability for [Zume] and suitability for the 'job' as outlined by [Paul]"; the reasons why Adam Prudent was not training and competing the Horse; the Horse's competition history and results; and "the Horse being an easy horse to ride, that the Horse was the 'schoolmaster' or 'packer' type horse that was appropriate and safe for a rider like [Zume] to ride and compete over 1.50–1.60 meter jumps for the first time and that the Horse met the requirements as outlined by [Paul]." *See* DE 116 ¶¶ 176-178; 190; 281-284.

With discovery closed, and upon careful review of allegations and the evidence in the record on summary judgment, the Court finds that the tort claims are not "separate from the performance of the contract" as the misrepresentations alleged are not external or independent to the alleged promises made in the agreement. In other words, all of the allegations that Defendants use to support their claims for fraudulent and negligent misrepresentation are intertwined with whether there was adequate performance under the contract—that is, whether the alleged statements and representations made in connection with the Horse transaction were breached by providing a horse that did not meet the contractual requirements set forth by Paul. *See Reagan Wireless Corp.*, 18-CV-61147, 2018 WL 4901127, at *3; *see also Inspirations Nevada LLC v. Med Pro Billing, Inc.*, 20-CV-60268, 2021 WL 2156677, at *6 (S.D. Fla. May 26, 2021).

As to Defendants' argument that the Court should deny the Joint Motion's request specifically as to the Prudent Parties because they lack privity with Defendants, this argument is rejected. Defendants have taken inconsistent positions as to who is responsible for any damages caused by the at-issue transaction throughout this litigation. For example, in summary judgment, Defendants took the position that Plain Bay does not have standing to bring the contract counts in its complaint because Plain Bay does not have a legal interest in the horse. [DE 459 at 9]. On

the other hand, Defendants take the position that "[t]he only parties in contractual privity are Zume Gallher and Plain Bay Sales, LLC." [DE 485 at 3]. Then, when it favors Defendants in their breach claims, and which argument the Court accepts, Defendants take the position that by virtue of Paul's position as Zume's agent, his third-party beneficiary status to the contract, and because he is not a stranger to the contract, he need not have signed the contract to be able to bring contractual claims against Plain Bay. [DE 485 at 28-31].

Moreover, Defendants allege that Adam and Henri own Plain Bay; Henri, Adam, and Katie work for Plain Bay; and, that Katie uses KMI as an instrument for her horse transactions. [DE 116 ¶¶ 6-9]. Defendants allege that "[a]ctions were taken by employees and agents of Plain Bay Sales to fraudulently induce [Zume] and [Paul] to enter into a transaction to purchase the Horse and to cause further damage to [Zume] and [Paul] after the transaction. These employees and agents of Plain Bay Sales include, without limitation: Katie Prudent, Adam, [and] Henri[.]" *Id.* ¶ 12.

Now, upon review of the complete record, the privity requirement as to the Prudent Parties for the independent tort doctrine to apply is clearly met. The evidence establishes that the Prudent Parties were a combination of owners, agents, and employees of Plain Bay. The Prudent Parties are not strangers to the contract here; they are sufficiently connected to, and beneficiaries of, the transaction and the Bill of Sale. Privity can be established as a third-party beneficiary or by agency. *Boddison v. Gen. Motors LLC*, 8:20-CV-2139-WFJ-AEP, 2021 WL 2685770, at *1 (M.D. Fla. June 30, 2021); *see also Feldman v. BRP US, Inc.*, 17-CIV-61150, 2018 WL 8300534, at *8 (S.D. Fla. Mar. 28, 2018) ("Additionally a plaintiff can pursue a claim of breach of implied warranty through third-party beneficiary law."); *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019) (collecting cases).

In addition, the Prudents' concede sufficient privity here. The Prudents jointly raised the independent tort doctrine, acknowledge that privity of contract is required for the doctrine to apply, and request that the tort claims against them be barred as a matter of law due to the independent tort doctrine. [DE 455 at 5-6].

Finally, this entire case centers around the contractual transaction of the Horse and the gravamen of Defendants' tort claims is that the Joint Parties failed to make good on their promise that the Horse met Paul's requirements and was suitable for Zume. To allow the tort claims to go to the jury for matters truly arising from contract frustrates the purpose of the independent tort doctrine. *See Peebles*, 223 So. 3d at 1069. This would also unnecessarily complicate the case and confuse the jury.

Thus, as a matter of law, summary judgment is granted in favor of all of the Joint Parties on Count 1, Count 10, and Count 2 (Civil Conspiracy).[13]

### 4. **Counts 6, 7, and 8: FDUPTA claims against the Joint Parties[14]**

The Joint Parties and Defendants seek summary judgment in their respective favor on Defendants' FDUPTA claims against the Joint Parties and Plain Bay alone—Count 6 alleges a

---

[13] Under Florida law, in order to state a claim for civil conspiracy, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Phillip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015) (citing *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)). "A civil conspiracy derives from the underlying claim that forms the basis of the conspiracy," and a "claim that is found not to be actionable cannot serve as the basis for a conspiracy claim." *Smith v. Jackson*, 16-81454-CIV, 2017 WL 1047033, at *5 (S.D. Fla. Mar. 20, 2017). Accordingly, no underlying actionable claim exists to support the conspiracy count and Count 2 fails as a matter of law.

[14] The Court wholly rejects the Joint Parties' argument that they are entitled to summary judgment on Count 6 and Plain Bay's argument that it is entitled to summary judgment on Count 7 based upon the theory that, because Defendants failed to disclose Paul's commission, "[Paul's] claim for lost commission as actual damages fails as a matter of law[.]" [DE 455 at 33]. The argument lacks citation to any legal authority to support its position that any such failure requires summary judgment in their favor. Regardless, this argument becomes irrelevant as the Court finds that there is no evidence that Paul has actual damages required under FDUPTA, discussed *infra*.

traditional violation of FDUPTA against the Joint Parties; Count 7 alleges a *per se* violation of FDUPTA for improper bill of sale against Plain Bay; and Count 8 alleges a *per se* violation of FDUPTA for refusal to honor return under section 501.142, Florida Statues, against Plain Bay.

To prevail on a FDUTPA claim, a plaintiff must show "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *Hucke v. Kubra Data Transfer, Corp.*, 160 F.Supp.3d 1320, 1328 (S.D. Fla. 2015). "A deceptive act or practice is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* at 1328 (internal quotation omitted). To satisfy the first element of the FDUTPA claim, a party may allege either a traditional or *per se* violation. *Felice v. Invicta Watch Co. of Am., Inc*., No. 16-CV-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017).

To establish a traditional FDUTPA violation, the plaintiff must show defendants engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.; *Feheley*, No. 08-cv-23060, 2009 WL 2474061, at *5.

A *per se* violation is established in one of two ways: (1) if the "law, statute, rule, regulation, or ordinance" expressly constitutes a violation of the FDUTPA or (2) the statute, rule or ordinance proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate. § 501.203(3)(c), Fla. Stat.; *Parr v. Maesbury Homes, Inc.*, No. 09-cv1268, 2009 WL 5171770, at *7 (M.D. Fla. Dec. 22, 2009). Though a violation of a predicate statute satisfies the first element of the FDUTPA claim, a party is still required to plead causation and damages. *Id.* at *8.

### i. Count 6: Traditional violation of FDUTPA against the Joint Parties

As to Count 6 brought by both Defendants, the Joint Parties argue that, as to Paul, summary judgment must be granted in the Joint Parties' favor because Paul has not pled nor proven actual damages. Paul alleges that he was damaged under FDUTPA because he lost commission and fees connected with training horses in his care. [DE 116 ¶¶ 251-252].

This Court agrees with the Joint Parties. As this Court has previously found, "[Paul] alleges he lost a commission. There are no other allegations of actual damages suffered by [Paul] sufficient to sustain a FDUTPA claim." [DE 101 at 9; DE 106 at 8].  The third amended counter-complaint does not cure this defect and the evidence fails to establish that [Paul] suffered actual damages. [DE 116 ¶¶ 251-242]. It remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA. *QSGI, Inc. v. IBM Global Financing*, Case No. 11–80880, *5, 2012 WL 1150402 (S.D. Fla. 2012); *Eclipse Med., Inc. v. Am. Hydro–Surg. Instruments, Inc*., 262 F.Supp.2d 1334, 1357 (S.D. Fla. 1999); *see also Marrache v. Bacardi U.S.A., Inc*., 17 F.4th 1084, 1098 (11th Cir. 2021) ("FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment.")  (internal quotation and citation omitted). Paul seeks only the expectancy of incidental and consequential damages of the commission, earning money to board, train, transport and compete the Horse, but nothing further. Paul's alleged damages may be recoverable if successful on his breach of contract claims, but not under FDUTPA. Accordingly, summary judgment is granted in Plain Bay's favor as to Paul's allegation against them on Count 6.

As to Count 6 brought by Defendant Zume, the Joint Parties argue for summary judgment in their favor because Zume has not brought forth any evidence of actual damages, and even if

she could, Zume's measure of damages is limited to the difference between the market price of Victorio as delivered and the contract price.  The Joint Parties contend that because their expert opined that the horse was worth close to $1,200,000.00 on March 15, 2018, the date of the sale, Zume incurred no actual damages because the Horse was actually worth more than the contract price. The Joint Parties also argue that the evidence reveals that Zume chose to refuse delivery of the Horse, causing her own damages.

FDUTPA provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover *actual damages*, plus attorney's fees and court costs[.]" § 501.211(2). Generally, actual damages under FDUTPA "are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Marrache v. Bacardi U.S.A., Inc*., 17 F.4th 1084, 1098 (11th Cir. 2021) (internal quotation and citation omitted); § 501.211, Fla. Stat. That is because when a plaintiff purchases a product with a defect, the product retains some value, meaning the benefit-of-the-bargain damages are less than the entire purchase price of the product in a deceptive trade practices claim. *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019). "However, there are two ways to measure actual damages in an FDUTPA claim: '(1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service.'" *Waste Pro USA v. Vision Constr. ENT, Inc*., 282 So. 3d 911, 920 (Fla. 1st DCA 2019) (quoting *HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc*., 302 F. Supp. 3d 1319, 1321 (M.D. Fla. 2016)); *see H & J Paving v. Nextel*, 849 So. 2d 1099, 1101 (Fla. 3d DCA 2003) ("A notable exception to the rule may exist when the product is rendered valueless as a result of the defect—then the purchase price is the appropriate measure of actual

damages.") (quoting *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984)).

Here, the parties dispute how to measure actual damages on these facts and the Court will not determine this matter on summary judgment. *See Exim Brickell LLC v. PDVSA Servs. Inc.*, 516 F. App'x 742, 759 (11th Cir. 2013) (discussing that all questions regarding the damages are generally issues of fact). The Court finds that if successful on Count 6 brought by Defendant Zume, she will be entitled to recover her actual damages incurred and no more. *See Venerus v. Avis Budget Car Rental, LLC*, 613CV921ORL41GJK, 2016 WL 11742053, at *9 (M.D. Fla. Mar. 29, 2016). However, the nature of the damages—whether they are the purchase price or something more under the FDUTPA for her actual damages—must remain an issue for trial, alongside the issue of damages from the alleged breaches.

### ii.  *Count 7: Per se violation of FDUPTA for improper bill of sale against Plain Bay*

Defendant Zume and the Joint Parties filed competing motions for summary judgment on Count 7, arguing entitlement to summary judgment in their respective favor.

Defendant Zume's Count 7 alleges a *per se* violation of FDUPTA for an improper bill of sale against Plain Bay.  Specifically, "[i]n selling the Horse to [Zume], Plain Bay Sales was obligated to use a written bill of sale in compliance with Rule 5H-26.004, Florida Administrative Code." [DE 116 ¶ 259]. "Plain Bay Sales' bill of sale does not comply with Rule 5H-26.004's requirements in that the bill of sale include a disclaimer of warranties." *Id.* ¶ 261. "Because Plain Bay Sales' bill of sale is materially inadequate and not in accordance with Florida law, [Zume] has been damaged in an amount of not less than $950,000 (with a credit for Plain Bay Sales partial refund of $455,434.10) along with other costs of the transaction including the cost of pre-purchase veterinary examinations." *Id.* ¶ 262. "Had Plain Bay Sales properly disclosed the condition of the Horse . . . or included a disclaimer of warranties on the bill of sale, [Zume]

would not have purchased the Horse." *Id.* ¶ 263. "Plain Bay Sales has violated Rule 5H-26.003 and committed a *per se* violation of Florida's Unfair and Deceptive Trade Practices Act, entitling [Zume] to damages[.]" *Id.* ¶ 265. [15]

The purpose of Chapter 5H-26 "is to address unfair and deceptive trade practices surrounding the sale and purchase of horses in Florida. This rule enhances consumer protection by implementation of minimum requirements relating to the sale and purchase of horses in Florida." Fla. Admin. Code Ann. r. 5H-26.001. "A violation of any provision of Chapter 5H-26, F.A.C., resulting in actual damages to a person, shall be considered an unfair and deceptive trade practice." Fla. Admin. Code Ann. r. 5H-26.003(13). As such, a violation of any provision of Chapter 5H-26 is an express *per se* violation of FDUTPA. *Id.* Applicable to this Horse and relevant here, the sale of this Horse "must be accompanied by a written bill of sale that must include at a minimum"

> The following statement: "As the person signing below on behalf of the Purchaser, I understand that any warranties or representations from the Owner or the Owner's agent that I am relying upon in acquiring this horse, including warranties or representations with respect to the horse's age, medical condition, prior medical treatments, and the existence of any liens or encumbrances, should be stated in writing as part of this bill of sale."

Fla. Admin. Code Ann. r. 5H-26.004(8).

Here, it is undisputed that the written Bill of Sale, prepared by Plain Bay, did not contain this required statement. However, given the conflicts in evidence presented by both parties, both summary judgment motions are denied as to Count 7. The jury will determine all relevant facts, including whether or not Defendants were actually damaged as a result of the lack of the required statement in the Bill of Sale.[16]

---

[15] The summary of the *per se* allegation in Count 7 omits the reference to William Martin as this issue was not litigated in summary judgment and has clearly been waived.

[16] The Court notes that although both parties discuss and dispute the medical condition of the Horse, the

iii.  *Count 8: Per se violation of FDUPTA for refusal to honor return under § 501.142, Florida Statues, against Plain Bay*

Defendant Zume's Count 8 alleges a *per se* violation of FDUPTA for refusal to honor return under section 501.142, Florida Statues, against Plain Bay. Plain Bay argues for summary judgment in its favor arguing that section 501.142 does not allow a private right of action and is in any event not applicable to Victorio because section 501.142 was intended to apply only to inanimate goods and not to a horse, and as a result, Plain Bay is entitled to summary judgment on Count 8 as a matter of law. Defendant Zume also moves for summary judgment in her favor on Count 8, arguing that section 501.142 allows a private right of action, the statute applies to the Horse, and she is entitled to summary judgment on Count 8 as a matter of law.

Section 501.142, Florida Statutes states:

(1) The regulation of refunds is preempted to the Department of Agriculture and Consumer Services notwithstanding any other law or local ordinance to the contrary. Every retail sales establishment offering goods for sale to the general public that offers no cash refund, credit refund, or exchange of merchandise must post a sign so stating at the point of sale. Failure of a retail sales establishment to exhibit a "no refund" sign under such circumstances at the point of sale shall mean that a refund or exchange policy exists, and the policy shall be presented in writing to the consumer upon request. Any retail establishment failing to comply with the provisions of this section shall grant to the consumer, upon request and proof of purchase, a refund on the

discussion is irrelevant to the *per se* violation alleged in Count 7, which clearly only alleges a *per se* violation for improper bill of sale due to the failure to include a disclaimer of warranties. [DE 116 ¶ 260]. Count 7 does not allege a *per se* violation of Rule 5H-26.003(12), which provides that "[w]hen an Owner or its agent provides any medical information in response to an inquiry from a Purchaser or its agent about the medical history of a horse, the Owner or its agent shall accurately disclose all information within its knowledge that is responsive to the inquiry."  As it relates to FDUPTA, the dispute regarding the medical condition of the Horse is arguably relevant in Count 6, which, as discussed *supra*, will go to the jury. The Court notes that in responding in opposition to Defendant Zume's FDUPTA arguments as they relate to the medical condition of the Horse, Plain Bay changes its position that summary judgment should be granted in its favor as a matter of law, and states that "the better course to is to proceed to a full trial on the disputed factual issues of the performance and medical condition of the Horse on March 15, 2018." [DE 483]. The Court does not appreciate the pattern, by all parties in this case, of taking inconsistent positions on summary judgment and throughout this case, and taking conflicting positions when it suits them, as such misleading conduct only serves to muddy the waters of what is essentially a very straightforward case and causes an unnecessary waste of scarce judicial resources.

merchandise, within 7 days of the date of purchase, provided the merchandise is unused and in the original carton, if one was furnished. Nothing herein shall prohibit a retail sales establishment from having a refund policy which exceeds the number of days specified herein. However, this subsection does not prohibit a local government from enforcing the provisions established by this section.

(2) The provisions of this section shall not apply to the sale of food, perishable goods, goods which are custom made, goods which are custom altered at the request of the customer, or goods which cannot be resold by the merchant because of any law, rule, or regulation adopted by a governmental body.

§ 501.142 (1)-(2), Fla. Stat.

Because the Court agrees with Plain Bay that section 501.142, Florida Statutes does not apply to a horse, the Court need not address whether section 501.142 allows for a private right of action under FDUTPA.[17] The Horse is an alive, sentient, unique good, akin to "the sale of food[,]" "perishable goods[,]" or "goods which are custom made[,]" which are excluded by section 501.142 subsection (2). Moreover, even if the Horse was not excluded under subsection (2), the Horse cannot be said to be "unused" after purchase. Every second a horse, or any living creature, is on the planet, it is more "used" than it was just a moment before. In addition, a horse cannot be said to be "merchandise" that is "unused and in the original carton, if one was furnished[.]" *See Zendejas v. Redman*, 15-81229-CIV, 2017 WL 2547202, at *4-6 (S.D. Fla. June 13, 2017) (collecting cases and discussing, in the context of the economic loss rule, that "as a living, breathing, sentient creature that constantly grows, learns, experiences, and changes based on both external and internal factors that often cannot be controlled by the seller," the horse at issue does not have the same "sort of fixed nature" to be considered a "product.").

---

[17] To be clear, this section of Florida's Consumer Protection laws is not expressly a violation of FDUTPA, which is section 501.201 through section 501.213. However, the parties have not cited to any case directly on point to support their positions for and against whether a violation of this statute may serve as a predicate for a FDUTPA claim, and it appears that no court has yet considered this issue. The Court notes that Plain Bay's argument that section 501.142 does not serve as a predicate for a FDUTPA claim is persuasive and most probably correct.

Accordingly, Count 8 against Plain Bay fails as a matter of law and summary judgment is due to be granted in Plain Bay's favor.

**5.**   **Count 12: Attorney Fees for False Florida RICO Violation against Plain Bay**

Plain Bay previously asserted a claim against Defendant Paul under Florida's Civil Remedies for Criminal Practices Act. [DE 38]. Defendant Paul moved to dismiss the RICO cause of action, asserting there was no legal support or basis for such claim. [DE 39]. Thereafter, Plain Bay voluntarily dismissed the RICO claim [DE 42] but filed an opposition to Defendants' motion to dismiss, contending Paul was not a prevailing party under the RICO statute (entitling him to recovery of attorney fees) because Plain Bay voluntarily dismissed the claim. [DE 43 at 7-8].

The prior presiding judge found: 1) Defendants' motion to dismiss the RICO claim was moot, given Plain Bay's voluntary dismissal of the claim; 2) it was premature to determine that Paul was entitled to fees because there had not yet been a finding that the RICO claim was "without substantial fact or legal support;" 3) Plain Bay's voluntary dismissal of the RICO claim did not preclude Paul from recovering fees under the statute; and 4) Paul may file a motion pursuant to Federal Rule of Civil Procedure 54(d) upon the entry of final judgment by the Court. [DE 51 at 10-11]. Thereafter, in ruling on a motion to dismiss, the prior presiding judge found that Count 12 was adequately pled. [DE 106].

Now, Defendant Paul is seeking summary judgment on his Count 12, titled "Attorney Fees for False Florida RICO Violation Allegation[.]" [DE 116 at 64]. Paul argues that, because Plain Bay voluntarily withdrew the RICO claim against Paul, Paul was the prevailing party on the RICO claim and that the RICO claim was made without substantial fact or legal support. *See* DE 459 at 33 (citing *Marcus v. Miller*, 663 So. 2d 1340, 1342 (Fla. 4th DCA 1995) (affirming

trial court's grant of attorneys' fees and costs to the defendants pursuant to § 772.104, Fla. Stat. after the Florida RICO claims against them were voluntarily dismissed); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc*., 03-20078-CIV, 2005 WL 8155975, at *2 (S.D. Fla. Feb. 9, 2005); *Thornber v. City of Ft. Walton Beach*, 568 So. 2d 914, 919 (Fla. 1990) (holding where a plaintiff voluntarily dismisses an action, the defendant is the prevailing party)).

Having the benefit of reviewing the full record, the Court finds that Count 12 is not a proper count to be decided either by the jury or by the Court on summary judgment; instead, the Court finds that the proper procedure to address the merits of Defendant Paul's request for fees for an allegedly false or meritless Florida RICO allegation is by a timely motion subsequent to entry of final judgment pursuant to Southern District of Florida Local Rule 7.3 and Federal Rule of Civil Procedure 54(d). At that time, the Court will address the merits of such a motion for fees and costs by examining the legal basis for Plain Bay's RICO claim. *Id.* This type of claim is not for a jury to decide as it will lead the trial off on a tangent in this case, with the jury tasked with addressing whether a previously withdrawn claim had factual or legal support. Defendant Paul's Count 12 is not the proper procedure to seek attorney's fees for a withdrawn RICO claim. As such, Defendant Paul's motion for summary judgment on Count 12 is denied and Count 12 is dismissed with leave to reassert entitlement to fees under Rule 54(b) and our Local Rules upon proper and timely motion at the conclusion of this case.

## V.    <u>CONCLUSION</u>

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendants' Request for Judicial Notice in Support of Motion For Summary Judgment [DE 529] is **GRANTED**; Plain Bay's Motion For Partial Summary Judgment Upon Plaintiff's Third Amended Complaint [DE 454] is **GRANTED IN PART AND DENIED IN PART**; The Joint

Omnibus Motion By Plaintiff Plain Bay Sales, And Counter And Third Party Defendants, For Summary Judgment Upon The Amended Counterclaim / Third Party Claim [DE 455] is **GRANTED IN PART AND DENIED IN PART**; and Defendants' Motion for Summary Judgment [DE 459] is **GRANTED IN PART AND DENIED IN PART**, all as follows:

1. The Court finds that summary judgment shall be granted against Plain Bay as to certain counts and parties in the Complaint [DE 256], to wit: summary judgment on Plain Bay's Count 6 against Defendant Paul is granted in favor of Defendant Paul Haunert, and summary judgment on Plain Bay's Count 9 against Defendant Zume Gallaher is granted in favor of Defendant Zume Gallaher. However, summary judgment is denied and not granted for any party on Counts 1, 2, and 3 against Defendant Zume Gallaher and those three counts shall proceed to trial, but Plain Bay shall not be entitled to seek punitive damages on Count 1. The punitive damages claim under Count 1 is hereby stricken.

2. The Court finds that summary judgment shall be granted as to certain  counts and parties in the Counter-Complaint [DE 116], to wit: summary judgment on Defendants' Counts 1, 2, and 10 against the Joint Parties is granted in favor of the Joint Parties; summary judgment on Defendants' Count 5 against Plain Bay is granted in favor of Plain Bay; summary judgment on Defendant Zume Gallaher's Count 8 against Plain Bay is granted in favor of Plain Bay; summary judgment on Defendant Zume Gallaher's Count 11 is granted in favor of Plain Bay; and summary judgment on Defendant Paul Haunert's Count 6 against the Joint Parties is granted in favor of the Joint Parties. Defendant Paul Haunert's Count 12 against Plain Bay is denied and dismissed without prejudice to the Defendant seeking attorney's fees on the

withdrawn RICO claim after judgment is entered in this case. Defendants' Counts 3 and 4 against Plain Bay, Defendant Zume Gallaher's Count 6 against the Joint Parties, and Defendant Zume Gallaher's Count 7 against Plain Bay shall all proceed to trial.

This case is specially set for a jury trial beginning on **February 28, 2022, at 9:00 a.m.** before United States Magistrate Judge William Matthewman at the U.S. Courthouse located at 701 Clematis Street, West Palm Beach, Florida.  [DE 398]. The parties and their counsel shall be ready and present for the jury trial at that time.[18] All remaining issues shall be resolved at the upcoming jury trial where the trier of fact will have an opportunity to hear and consider all the relevant and probative evidence and make credibility determinations.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 10th day of February, 2021.

WILLIAM MATTHEWMAN
United States Magistrate Judge

---

[18] If the parties believe in good faith that a Settlement Conference before a United States Magistrate Judge will assist them in potentially resolving this case prior to trial, they may file a joint motion requesting a Settlement Conference to be held before a U.S. Magistrate Judge, and the Court will attempt to locate a U.S. Magistrate Judge available to conduct the Settlement Conference. The parties are also free to schedule a further mediation session with a private mediator. However, any settlement efforts or settlement scheduling will not be sufficient good cause to continue the scheduled February 28, 2022 specially set trial as the Court fully intends to adhere to that trial date.